## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Geraldine Herbert,                    :
                    Petitioner        :
                                      :
        v.                            :    No. 1129 C.D. 2018
                                      :    SUBMITTED: April 11, 2019
Unemployment Compensation Board of :
Review,                               :
                    Respondent        :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                                     FILED: May 1, 2019

Geraldine Herbert (Claimant) petitions for review of the July 17, 2018 Order of the Unemployment Compensation Board of Review (Board) affirming a Referee's decision to deny Claimant unemployment compensation (UC) benefits under Section 402(b) of the Unemployment Compensation Law (Law).[1]  The Board concluded that Claimant was ineligible for UC benefits because she voluntarily quit her employment without cause of a necessitous and compelling nature.  For the reasons that follow, we affirm the Board's Order.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b).  Section 402(b) of the Law states that an employee shall be ineligible for UC benefits for any week "[i]n which [her] unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature."  43 P.S. § 802(b).  The Board also determined that Claimant was able and available to work and, thus, was not disqualified from receiving UC benefits under Section 401(d)(1) of the Law, 43 P.S. § 801(d)(1).  Claimant does not challenge the Board's ruling under Section 401(d)(1) on appeal.

**Background**

Claimant worked as a housing counselor for Consumer Credit Counsel (Employer) from June 5, 2017 through November 30, 2017. Bd.'s Finding of Fact (F.F.) No. 1. In mid-September 2017, Employer notified Claimant that she was supposed to complete client billing packages as part of her work, but she had not done so. *Id.* No. 2; Notes of Testimony (N.T.), 3/19/18, at 16. Employer instructed Claimant to complete the billing packages. Bd.'s F.F. No. 2. Claimant told one of her supervisors, Rosemary Lavelle, that completing the billing packages was stressful but that she would do her best to catch up. *Id.* Claimant asked Ms. Lavelle to remove her from the calendar so that she could catch up on her work, but Ms. Lavelle denied the request. *Id.*

In August and September 2017, Claimant informed both of her supervisors, Ms. Lavelle and Marilou Protulipac,[2] that her work was becoming overwhelming and exasperating. *Id.* No. 4; N.T., 3/19/18, at 18, 21. Claimant told Ms. Lavelle that she was having issues with anxiety, that her psychiatrist had increased her medication, and that she believed the increased medication would help with her anxiety. Bd.'s F.F. No. 5; N.T., 3/19/18, at 14-15.

In late September or early October 2017, Employer's then-Vice President, Mary Loftus, verbally warned Claimant that she was behind in her work. Bd.'s F.F. No. 6; N.T., 3/19/18, at 27. Claimant did not mention any health issues to Ms. Loftus during that conversation. Bd.'s F.F. No. 6.

Claimant was under the care of both a psychiatrist and a counselor. *Id.* No. 7. While Claimant had discussed her work-related stress with her psychiatrist and her

---

[2] The transcript of the Referee's hearing identifies Claimant's supervisor as "Mary Lou Patrillipack (phonetic)," N.T., 3/19/18, at 10, but the record shows that the supervisor's name is "Marilou Protulipac," *see id.*, Exs. R-28, R-29, & R-30.

counselor, neither provider gave Claimant any limitations or special instructions regarding her ability to work. *Id.*; N.T., 3/19/18, at 15. Claimant did not inform Employer that she needed any accommodations due to a medical condition. Bd.'s F.F. No. 9.

Between August and October 2017, Employer gave Claimant significantly more time to complete her work than other housing counselors, but Claimant was still unable to complete her work. *Id.* No. 3.

On October 30, 2017, Claimant submitted a letter of resignation to Employer. *Id.* No. 8. In the letter, Claimant stated:

> I am writing to provide you a 30[-]day notice of my resignation from my position as Housing Counselor with [Employer]. My final day will be Friday, December 1, 2017. I have enjoyed working with the customers and the opportunity to assist them in their homeownership journey. However, the position in the Harrisburg/Carlisle office is very stressful for just one counselor and should have two active counselors[] persons [sic]. In addition, I believe that more adequate training from the beginning would be beneficial to future hires.

N.T., 3/19/18, Ex. R-28; Bd.'s F.F. No. 8. Claimant did not cite any medical issues as the reason for her resignation in the letter. Bd.'s F.F. No. 8.

Following her resignation, Claimant filed a claim for UC benefits. The local UC Service Center found that Claimant voluntarily left work for health reasons and needed to work in a stress-free environment, but she did not inform Employer of her work limitations. Not. of Determ., 12/3/17, at 1. Therefore, the Service Center determined that Claimant failed to establish a necessitous and compelling reason for voluntarily quitting her employment under Section 402(b) of the Law. *Id.*

3

Claimant appealed to the Referee, who held a telephone hearing on March 19, 2018. Claimant testified on her own behalf, and Employer presented the testimony of Ms. Loftus, Employer's President and Chief Executive Officer.[3]

Claimant testified that she moved from West Virginia to Harrisburg to accept the position with Employer. N.T., 3/19/18, at 11. Claimant explained that her job duties were to meet with clients and manage their housing paperwork, including applications for Pennsylvania's Homeowners Emergency Mortgage Assistance Program (HEMAP). *Id.* at 10. Claimant testified that initially she spent two to three hours counseling each client and additional time after each client meeting to complete the necessary paperwork. *Id.* at 11. However, Employer later informed Claimant that she was supposed to spend only two to three hours total per transaction. *Id.*

Claimant also testified that when she began working for Employer in June 2017, she worked in the Harrisburg office, which was close to her home, but one month later, the office moved to Lemoyne, which was further from her home. *Id.* at 11-12. Also in July 2017, Employer informed Claimant that she would need to travel to Carlisle once per week to meet with clients. *Id.* at 12.[4] Claimant testified that her work began to pile up due to the increased travel time, so she began to work longer hours. *Id.* at 13. Although she was working extra hours, she was paid for 37.5 hours per week and was not paid overtime. *Id.*

---

[3] Ms. Loftus was Employer's Vice President at the time of Claimant's employment but subsequently became the President and Chief Executive Officer. Heather Murray, Employer's Manager of Community Relations, was also present at the hearing, but she did not testify.

[4] In her Brief in Support of Appeal filed with the Board, Claimant stated that Lemoyne is about 15 miles from Harrisburg, and Carlisle is about 30 miles from Harrisburg. Record (R.) Item No. 10 at 1.

Claimant testified that in August 2017, she approached her supervisor, Ms. Lavelle, "and I actually was crying when I talked to her because I was upset feeling that I wasn't keeping up with everything and that everything was kind of being given to me last minute." *Id.* at 12. Ms. Lavelle told Claimant "to hang in there [and] that it would all work out." *Id.* at 13. Claimant also testified that she told Employer's then-Vice President, Ms. Loftus, that when she accepted the position, she did not expect to travel to Carlisle, but Ms. Loftus responded that it was "part of her job." *Id.* at 20.

Claimant testified that she was taking medication for anxiety at that time. *Id.* at 14. She explained that "by August I was taking one [dose] a day to cope. And then by the time September came around I was taking two [doses] a day to get through the day and trying to stay calm and level so that I could work with my clients." *Id.* Claimant informed Ms. Lavelle that "I was having issues with my anxiety and stress levels and that I had increased my one pill and that . . . I was hoping that would help with everything." *Id.* Claimant also testified that she suffered a concussion in September 2017, which she reported to Ms. Loftus. *Id.* at 14-15.

Claimant further testified that she had been treating with a counselor and a psychiatrist since 2013 and that she was diagnosed with depression, generalized anxiety, and bipolar disorder. *Id.* at 15. When asked if her medical providers had imposed any limitations on her ability to work, Claimant replied:

No, they just gave me . . . the psychiatrist prescribed medication and you know, I never had any issues with work. So . . . we would discuss it at our counseling sessions. And [in October 2017] [the psychiatrist] suggested that I reconsider this position because it was increasing the symptoms I was having for the depression and the anxiety.

5

*Id.*

Claimant testified that when Ms. Loftus approached her in late September or early October 2017 about being behind in her work, Claimant told her it was "all she could do." *Id.* at 16. According to Claimant:

> I had requested additional time off the calendar so that I could catch up especially once they had, the middle of September when they told me I needed to be doing billing packages and I had been there since June and that was the first time I had heard of that. That is why the piles of folders were placed outside the drawer. While I continued to counsel I was also trying to get these billing statements and the files reorganized for that purpose.

*Id.*

Finally, Claimant testified that she "absolutely" explained her specific medical conditions to her supervisors and that she "made them aware that things were slower for" her and that her "doctor suggested that [she] be more cautious with details." *Id.* at 21-22.

Ms. Loftus testified on Employer's behalf. Ms. Loftus testified that, at the time of Claimant's hiring, she informed Claimant "that the [Harrisburg] office was closing and that we were moving to Lemoyne." *Id.* at 22. Ms. Loftus explained:

> We also made every applicant aware that if they accepted the position they would have to travel [to Carlisle] and [Employer] would reimburse [them] for mileage, which we did. We also let [our employees] leave at 4:00 when they traveled to Carlisle. So . . . the candidates as well as [Claimant] were fully aware of that requirement.

*Id.* at 22-23. Ms. Loftus specifically recalled telling Claimant about the move to Lemoyne, as "there were only two candidates that we interviewed for that position, so . . . I had notes of what I wanted to make sure that I told people." *Id.* at 27.

6

Ms. Loftus offered into evidence a utilization report comparing the amount of work Claimant completed in the months of August, September, and October 2017 to that of two other housing counselors. *Id.* at 23. Ms. Loftus testified that, based on the information in the report, the other counselors "had far less time per [client]" than Claimant and Claimant had "more than adequate time to complete the counseling and any associated follow[-]up." *Id.* & Ex. R-34.

Ms. Loftus testified that the only health issues of Claimant's of which she was personally aware were a broken tooth and a concussion, because Claimant had requested time off for each. *Id.* According to Ms. Loftus, neither of Claimant's supervisors ever informed her that Claimant was suffering from any other health conditions, and she had "no reason to think that [the supervisors] would not have brought that information to me." *Id.* at 25-26.

Ms. Loftus also testified that in late September or early October 2017,

> I had a . . . conversation with [Claimant], which I told her was a verbal warning because she was so far behind with all of her work. And during that conversation[,] she never mentioned any issues. She just said that the HEMAP[] [applications] were taking her three hours and that the pre-closing pre-certifications were taking two hours. I went through that same [u]tilization [r]eport that I provided as evidence with her and *she really had no reasons as to why she was behind. And she never told me that there were any kind of medical issues that were preventing her from keeping up with her work.*

*Id.* at 26-27 (emphasis added). Ms. Loftus testified that she intended to have a follow-up meeting with Claimant a few weeks later, but Claimant resigned before that occurred. *Id.* at 27.

Following the hearing, the Referee affirmed the Service Center's decision. The Referee resolved the conflicts in the testimony in Employer's favor and credited Ms. Loftus's testimony. Ref.'s Order, 3/20/18, at 2. The Referee found that

7

"Claimant was notified of the job conditions and work sites at hire." *Id.* The Referee also found that although Claimant had discussed her health issues with her supervisors, she "never raised a medical concern with [Ms. Loftus] as the reason for her work issues during the verbal warning in late September 2017." *Id.* Because Claimant failed to establish a necessitous and compelling reason for voluntarily quitting, the Referee concluded that she was ineligible for UC benefits under Section 402(b) of the Law. *Id.*

Claimant appealed to the Board, which affirmed the Referee's decision. The Board likewise resolved the evidentiary conflicts in Employer's favor and credited Ms. Loftus's testimony. Bd.'s Order, 7/17/18, at 3. The Board concluded:

> [C]laimant did not inform [E]mployer of the extent of her medical condition or that it necessitated an accommodation. *[C]laimant did inform her supervisors that she found the job stressful and that she has anxiety for which she was taking medication. She also informed [E]mployer that her medication was being increased and should help with her anxiety.*
>
> [C]laimant did not provide any documentation from a treating medical provider to show she could not perform her work or needed an accommodation. *Although she asked to be taken off the calendar, her reason for doing so was to catch up after she was informed she failed to complete billing packages and had to go back and complete them for each of her cases and not because of any medical issue.*
>
> We do not find that [C]laimant acted in a reasonable manner in quitting her employment or that she made a reasonable effort to maintain her employment.

8

*Id.* (emphasis added). Therefore, the Board determined that Claimant was ineligible for UC benefits under Section 402(b) of the Law. *Id.* Claimant now appeals to this Court.[5]

## Issues

(1) Did Claimant have a necessitous and compelling reason for leaving her employment?

(2) Did Claimant provide sufficient notice to Employer of her health condition?

(3) Did the Board err in finding that Claimant did not act in a reasonable manner in quitting her employment?

(4) Did the Board err in finding that Claimant did not make a reasonable effort to maintain her employment?

## Analysis

To qualify for UC benefits under Section 402(b) of the Law, the claimant has the burden of proving that she had a necessitous and compelling reason for voluntarily leaving her employment. *St. Clair Hosp. v. Unemployment Comp. Bd. of Review*, 154 A.3d 401, 404 (Pa. Cmwlth. 2017) (*en banc*). Specifically, the claimant must prove that: (1) circumstances existed that produced real and substantial pressure to terminate her employment; (2) such circumstances would compel a reasonable person to act in the same manner; (3) the claimant acted with ordinary common sense; and (4) the claimant made a reasonable effort to preserve her employment. *Solar Innovations, Inc. v. Unemployment Comp. Bd. of Review*, 38 A.3d 1051, 1056 (Pa. Cmwlth. 2012). The claimant must demonstrate that she took

---

[5] Our review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the Board's findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

9

"all necessary and reasonable steps to preserve the employment relationship" before voluntarily quitting. *St. Clair*, 154 A.3d at 404-05 (quotation omitted).

Claimant contends that her health conditions made it impossible for her to continue working for Employer without an accommodation. "[T]o establish that a medical condition is a necessitous and compelling reason for the voluntary termination of one's employment, a claimant must: (1) establish, through competent evidence, the existence of a medical condition; (2) inform the employer of the condition; and (3) be able and available to work if a reasonable accommodation can be made." *Id.* at 405.

"[A] claimant who desires to quit a job for health reasons must communicate her health problem[] to her employer so that the employer can attempt to accommodate the problem." *Blackwell v. Unemployment Comp. Bd. of Review*, 555 A.2d 279, 281 (Pa. Cmwlth. 1989). Before an employer's duty to accommodate is triggered, the employer must have sufficient knowledge of the claimant's health condition. *See id.* The claimant must communicate her "specific physical restrictions" to the employer and "explain [to the employer] her inability to perform her regularly assigned duties." *Fox v. Unemployment Comp. Bd. of Review*, 522 A.2d 713, 715 (Pa. Cmwlth. 1987).

"[O]nce an employee makes an employer aware of such health problems, the employer bears the burden [of] establish[ing] that it made a reasonable attempt to identify and propose possible accommodations for the employee's health problems." *Watkins v. Unemployment Comp. Bd. of Review*, 65 A.3d 999, 1005 (Pa. Cmwlth. 2013). "Only through communication can an employer be afforded an opportunity to *accommodate* a claimant's problem by offering suitable work." *Fox*, 522 A.2d at 715.

Here, Claimant testified that she was treating with both a counselor and a psychiatrist for depression, anxiety, and bipolar disorder. N.T., 3/19/18, at 15. However, when asked whether either provider had given her "any special orders or limitations when it came to work," Claimant replied "[n]o" and stated that her psychiatrist had only prescribed an increase in her medication. *Id.*

The record shows, and the Board found, that Claimant had discussed her stress and anxiety with her supervisors in August and September 2017. Bd.'s F.F. Nos. 4, 5. However, the last time Claimant discussed those issues with her supervisors, she stated that she had increased her medication, which she believed would help alleviate her symptoms. *Id.* No. 5; *see* N.T. 3/19/18, at 14-15, 21. According to Claimant, "I told [Ms.] Lavelle that I was having issues with my anxiety and stress levels and that I had increased my one pill and that . . . I was hoping that would help with everything." N.T., 3/19/18, at 14. There is no evidence that Claimant subsequently informed either of her supervisors or Ms. Loftus that her efforts to reduce her anxiety with medication had been ineffective before she voluntarily quit her employment.

Furthermore, Ms. Loftus testified that had Claimant presented Employer with specific medical restrictions, "we would have worked with her. We would [have] had to have an understanding from a medical provider as far as what limitations there were and then we would have . . . tried to work with her as far as if [sic] we could . . . what would be a reasonable accommodation." *Id.* at 25. Significantly, Ms. Loftus testified that when she confronted Claimant about being behind in her work in late September or early October 2017, Claimant "never mentioned any issues . . . [a]nd she never told me that there were any kind of medical issues that were preventing her from keeping up with her work." *Id.* at 26. While Claimant testified that her psychiatrist had advised her to reconsider the position with Employer in October

11

2017, *id.* at 15, Claimant never communicated that information to Employer before quitting.

The Board resolved the conflicts in the evidence in Employer's favor and specifically credited Ms. Loftus's testimony. Bd.'s Order, 7/17/18, at 3. It is well settled that the Board is the ultimate factfinder in UC cases and is empowered to resolve conflicts in the evidence and determine the credibility of witnesses. *Metro. Edison Co. v. Unemployment Comp. Bd. of Review*, 606 A.2d 955, 957 (Pa. Cmwlth. 1992). Where the Board's factual findings are supported by substantial, credible evidence, those findings are conclusive on appeal. *Brandt v. Unemployment Comp. Bd. of Review*, 643 A.2d 78, 79 (Pa. 1994).

Claimant also argues that Employer denied her request for an accommodation when she asked to be taken off the calendar in September 2017. However, by Claimant's own testimony, the reason Claimant made that request was to catch up on her work after she was instructed to complete the client billing packages. N.T., 3/19/18, at 16-17; Bd.'s Order, 7/17/18, at 3. She did not make that request for medical reasons.

We conclude that Claimant did not provide Employer with sufficient information about her health conditions to trigger Employer's duty to offer her a reasonable accommodation. The last time Claimant spoke to her supervisors about her anxiety, she told them she was going to increase her medication, which she hoped would alleviate the problem. There is no evidence that, after those discussions, Claimant informed Ms. Lavelle, Ms. Protulipac, or Ms. Loftus that her effort to treat her anxiety had been unsuccessful or that her psychiatrist had advised her to reconsider the position with Employer. In fact, Ms. Loftus credibly testified that, during her final conversation with Claimant shortly before her resignation, Claimant

12

did not mention any health issues at all. Bd.'s F.F. No. 6. Therefore, Employer could not have known that Claimant's health conditions were of such a magnitude that she could no longer perform her job duties.

### Conclusion

Based on the evidence credited by the Board, we conclude that Claimant failed to establish a necessitous and compelling reason to voluntarily quit her employment. Accordingly, we affirm the Board's Order.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Geraldine Herbert,                       :
                    Petitioner           :
                                         :
        v.                               :        No. 1129 C.D. 2018
                                         :
Unemployment Compensation Board of :
Review,                                  :
                    Respondent           :

# **O R D E R**

AND NOW, this 1st day of May, 2019, the Order of the Unemployment Compensation Board of Review, dated July 17, 2018, is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge